**STONE et al. v. UNITED STATES.**

No. 10968.

Circuit Court of Appeals, Ninth Circuit.

Feb. 13, 1946.

As Modified on Denial of Rehearing
April 17, 1946.

Morris Lavine, of Los Angeles, Cal., for appellants.

Charles H. Carr, U. S. Atty., James M. Carter, Asst. U. S. Atty., William Strong, Sp. Asst. U. S. Atty., and Homer H. Bell, Asst. U. S. Atty., all of Los Angeles, Cal., for appellee.

Before GARRECHT, DENMAN, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from sentences imposed upon the appellants upon their pleas of nolo contendere to their indictment with 130 other railway employees, of whom appellants, to sustain one of their claims of error, state that by their conviction "practically two entire unions were wiped out."

The indictment charged them with conspiring to violate the Act of February 13, 1913, 37 Stat. 670, as amended January 21, 1933, 47 Stat. 773, 18 U.S.C. § 409, 18 U.S. C.A. § 409. The Act provides, so far as pertinent here, that " * * * whoever shall * * * unlawfully take by any fraudulent device, scheme, or game, from any * * * dining car, or from any passenger * * * while on or in such * * * dining car, when such car is a part of a train moving from one State * * * to another State * * * any money, * * * shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both * * *."

The conspiracy of the accused as charged in the indictment is " * * * they would steal and would unlawfully take money by fraudulent devices, schemes, and games from the dining cars of the Union Pacific Railroad Company while said dining cars were a part of a train moving in interstate commerce over the Union Pacific Lines from Los Angeles, California, to Omaha, Nebraska, and from Omaha, Nebraska to Los Angeles, California; and would receive and have in their possession such money knowing the same to have been so taken and stolen; * * *"

The unlawfulness of the taking, among others charged, is: "That said defendants in serving meals to military personnel who would have and use government meal orders, on some occasions would serve meals to such military personnel without presenting or using any meal check, and on other occasions would re-use meal checks previously used by and paid by other passengers, and on other occasions would pretend to use a regular meal check, but would not write or cause anything to be written thereon and would discourage said military personnel from writing anything thereon; and thereafter the defendant steward or as-

sistant steward on that dining car would reuse meal checks previously used and paid by other passengers and would note memoranda thereon, pretending to indicate such checks to have been used in the serving of meals to said military personnel under said meal orders, and said steward or assistant steward would thereupon abstract out of the funds previously collected from other passengers an amount of money equal to and offset by the amount of said governmental orders so used, and the money so abstracted would thereupon be divided among the steward, assistant steward, chef, and waiters employed on such dining car at said time and would be retained by such defendants and converted by them to their own use and benefit; and no part thereof would be turned over or paid to the rightful owner, namely, said Union Pacific Railroad Company."

Among the overt acts is charged: "On September 23, 1944, on a dining car constituting a part of a train moving and traveling in interstate commerce over said Union Pacific Lines between the Cities of Los Angeles, California and Omaha, Nebraska, while said train was moving between Los Angeles and Riverside, California, and all within the Southern District of California, Central Division thereof, defendants Ralph Emerson Chapel, as Steward and William Lawson, as Waiter, served meals to one Benedict P. Cruise and to two Marines and a soldier, whose names are to the Grand Jurors unknown, all of whom were traveling as passengers on said train, and said defendants then and there failed to write or have said passengers write any meal order on any meal checks, and said defendant Lawson at the conclusion of said meals collected the price thereof from said passengers and turned in to the defendant Chapel meal tickets which had been previously completely filled out as to the top and as to the portion provided for the price of the meals, and on which no meal orders were written by either of the said defendants or by any of said passengers, and said defendants failed to detach and deliver to said passengers any receipt portion of any meal checks."

■ Appellants contend that the indictment charges no crime against the United States because the wrongful taking is not in interstate commerce, but a mere offense, if any, against state law. Appellants' opening brief on appeal ignores the portions of the Act in the amendment concerning the unlawful taking of money from a dining car, which money has been obtained by "fraudulent device," and argues as if it did not exist. It relies upon Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160, holding that intrastate production destined to interstate commerce is not a subject of that commerce, and hence that Congress has no power of regulation of the conduct of persons engaged in such production. The brief does not cite the succeeding case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, which holds that persons engaged in such production are subject to Congressional regulation. In briefs for this court we are entitled to a consideration of the law as it existed at the time the charged fraud was committed and to the presentation of cases adverse to an appellant's contention and their distinguishing, if possible.

There is no merit in this contention. A passenger on a train moving from Los Angeles to Omaha, Neb., must eat—customarily in the dining car. His payment of money to the railway company for his meals, supplied by the company, is a customary and often a necessary incident of his interstate transport. Conspiring to defraud the owner of that money and to take it for one's own use when the conspirator leaves the dining car, obviously concerns action conspired to be performed in interstate commerce and hence within the regulatory power of the Congress.

■ The sentence of each of the appellants was for one year in a county jail and a fine of $500. The sentences were suspended for a period of 18 months "on conditions that said fine is paid; that during said period of 18 months the defendant shall not violate any laws of the United States; and that defendant shall not during said period apply for employment as or be employed as a steward or assistant steward on any railroad engaged in interstate commerce."

Appellants contend that though the court could have jailed them, it is beyond the court's power to make it a condition of their release from their jail sentence that they do not return to their interstate employment, where they would necessarily be traveling from one state to another and from one probation officer's jurisdiction to another, because it would deprive them of the occupation in which they were engaged last before their indictment.

There is no suggestion that this last employment is the only one in which ap-

pellants could earn a livelihood. There was no answer to our inquiry, at the hearing, why the judge in granting probation should not prevent them, in the probationary period, from the temptation to continue to cheat their employer in the manner in which their plea admitting the charged overt acts shows they were successful. We regard the claim of error as obviously frivolous and its consideration a waste of the time and energy of this court.

A third contention, the propriety of which commands our consideration, is stated to be pressed at the request of one or another of the two railway unions to which the appellants and their 130 co-conspirators belong, which unions, the appellants' brief states, "were practically wiped out" by the convictions in the court below. The contention assumes that Congress in the instant legislation effectively has created an offense against the United States if it has the power so to do. The claim is that Congress has not such power because the offenders are members of the railway unions. The argument is that such conspiring to cheat the employer involves a mere labor dispute, and hence a matter over which the *prior* legislation of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., gives initiatory if not final jurisdiction to its mediation proceedings.

The appellants' brief states the contention: "Where railway employers and railway employees have a dispute over the amounts of money collected or paid by stewards and waiters from passengers, and whether such monies have been embezzled, should this transaction be adjudicated first under the Railway Labor Act and before the District Court acquires jurisdiction for any purpose whatsoever?"

The brief argues that section 152 of the Railway Labor Act covers a conspiracy to commit such crimes in interstate transport by its provision that the railway and its employes "settle all disputes whether arising out of the application of such agreements, or otherwise, in order to avoid any interruption to commerce or to the operation of any commerce growing out of any dispute between the carrier and the employees thereof."

The brief continues: "By the simple expedient of referring the matter to the United States Attorney the clear purposes of this Act were evaded and avoided. One hundred thirty-five employees engaged in the operation of carriers were thus removed in all parts of the United States from different railroads growing out of disputes over whether some patrons at the dining table had paid money, which money it was claimed had not been turned into the railroad. *Practically two entire unions were wiped out* and the Court made a condition of probation which prevented the carrying out of the clear purposes of the Railway and Carriers by Air Labor Act, as expressed in Section 152 of the Act. [Emphasis ours.] It is respectfully submitted that it was the clear intent of Congress to prevent just such situations arising that required that all these disputes and matters be first referred and handled in the manner clearly designated by Title 45, Section 152, and that in fact Congress itself provided a penalty for a failure to so comply * * *"

Probably organized labor has promoted no legislation more valuable to its members than the Anti Coupling Pin Act. The contention here advanced means that the federal conspiracy statute would have no validity if all the railway companies should conspire to use the former maiming and killing link and pin couplers on their trains, despite the penalizing provisions for not using automatic couplers, 45 U.S.C.A. §§ 2, 13 and 6, because the use of couplers is a mere matter of working conditions, exclusively controlled by the Labor Railway Act.

Although, at the hearing, we indicated our views on appellants' contention, it was not only not withdrawn but was further pressed. We can think of no concept more perversive of our constitutional government than that Congress has created an imperium in imperio in which there can be no dispute between the government and a person charged with the offense of embezzling from his employers—that is, no criminal prosecution—because the employer is a railway company and the embezzler is a member of a labor union. The thesis that an employee's embezzlement from his employer is a mere labor dispute to be settled by collective bargaining is a suggestion that members of organized labor have been legislated into a class cast above and exempt from general laws against mean, despicable thieves and cheats. To say nothing as to the constitutionality of such a contention, we feel that responsible and intelligent labor leaders, thinking through the import of such a thesis, would be the first to disavow it.

The judgments sentencing the appellants are affirmed.